IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IVAN RAY CARTER, JR.,

        Petitioner,                 No. CIV S-07-2471 GEB CHS P

    vs.

DARRYL ADAMS, Warden,

        Respondent.              FINDINGS AND RECOMMENDATIONS

_____/

I.     INTRODUCTION

        Petitioner Ivan Carter is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner attacks his conviction in the Solano County Superior Court, case number VCR165496, for first degree murder.

II.     CLAIMS

        Petitioner claims that:

        A.     A juror provided extraneous information during deliberations;

        B.     The jury improperly discussed the fact that petitioner did not testify;

        C.     There was insufficient evidence to support his conviction; and

        D.     The prosecutor committed misconduct.

        Upon careful consideration of the record and the applicable law, the undersigned

will recommend that petitioner's petition for habeas corpus relief be denied.

III.   FACTUAL AND PROCEDURAL BACKGROUND

A.   Facts[1]

*Prosecution Case*

The victim, Michael White, and his girlfriend, Tiffany Vollmer, lived together in an upstairs apartment unit at 267 Reis Avenue in Vallejo. Defendant and his girlfriend, Diniel Jaramillo, lived in an adjoining upstairs unit at 265 Reis Avenue. In late December 2001 or early January 2002, White and Vollmer slammed the door to their apartment during an argument. The slamming of the door caused Jaramillo's new clock to fall off the wall and break. Jaramillo testified that the clock cost $45, and that White promised her three or four times that he would replace it as soon as he had the money.

In January 2002, Vollmer overheard defendant discussing the broken clock with White at the door of their apartment. Defendant sounded angry. Another time, Vollmer heard defendant in the hallway telling White that there was a $50 debt to be paid. According to Vollmer, defendant sounded very irate.

On February 22, 2002, Jaramillo and defendant moved out of the Reis Avenue apartment. They moved in with Jaramillo's cousin, Christina Maxwell, and her husband, Jason Maxwell, at 218 Carolina Street. Jaramillo returned to the Reis Avenue building with defendant and Christina on February 27, 2002, about 2:30 p.m. Jaramillo saw White in front of the building talking to the mother of his two children, Delores Henderson. She approached White and angrily told him that he owed her $50 for the clock. Henderson heard Jaramillo say that if White did not have the money by the end of the day, he would "see what happens." Jaramillo then got into the car and left with defendant and Christina.

That evening, defendant and Christina were drinking at the Carolina Street apartment after Jaramillo had gone to bed. Jason Maxwell returned home shortly after 2:00 a.m. Christina eventually went to bed, and Maxwell and defendant began discussing debts that were owed to Maxwell.[FN] Maxwell sold methamphetamine and told defendant that he had been trying to collect from a buyer who owed him money. Defendant said someone owed him money too, and told Maxwell he would show him how to collect money owed to him. Defendant ran upstairs to his room and returned wearing black pants, a black sweater, and

---

[1] This statement of facts is taken from the March 30, 2006 opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), filed with respondent's answer as Exhibit G.

2

black shoes. As Maxwell and defendant left the apartment, defendant said he was going to go get his money.

> FN. Originally charged as a codefendant in the murder of Michael White, Maxwell pleaded no contest to voluntary manslaughter and received a stipulated, 14-year prison term in exchange for his testimony in the prosecution of defendant.

Maxwell was carrying a loaded .357 revolver on him. Defendant drove past his old apartment on Reis Avenue, turned left at the next corner, and parked his car on the next street over from Reis. As they were getting out of the car, defendant told Maxwell he was going to "[l]ay the dude down," which meant to Maxwell that he was going to kill him. Maxwell gave defendant the gun before they got out of the car. On the way to the apartment, defendant put a ski mask over his face, and gave Maxwell a sweater to put around his face.

Defendant went up the stairs to White's apartment while Maxwell stayed downstairs and acted as the lookout. Maxwell heard defendant "hit" White's front door. After a pause, Maxwell heard defendant whispering for him to come up the stairs. When Maxwell came up, defendant asked him to kick the door in. Maxwell was able to kick the door partially open, causing the door to splinter. Defendant rushed into the dark apartment. Maxwell heard two gunshots in close succession immediately after defendant entered the apartment. Between the shots, he heard a moaning sound from inside the apartment. After the second shot, Maxwell ran down the stairs. When he reached the bottom of the stairs, Maxwell heard a third and possibly a fourth shot.

A short time later, defendant came down the stairs and he and Maxwell ran to the car. On the drive back to Carolina Street, defendant while "gloating" said, "Yeah, nigga, that's how you do it." Defendant said that he had put "three in his head." Defendant asked Maxwell to give him the shells. Maxwell emptied the gun and dumped the shells into defendant's hand.

The autopsy of White revealed that he had been shot four times in the head. Three of the shots were fired from an intermediate range (a few inches to one or two feet away), while the fourth shot was a contact wound. A blood test revealed that White had methamphetamine in his system at the time of death.

When Maxwell and defendant got home, Maxwell hid the gun in the fireplace. Both men changed their clothes. They then drove back to Reis Avenue and parked the car around the corner. They were walking toward the crime scene when they were contacted by a Vallejo police officer. Defendant appeared to be intoxicated and became argumentative and hostile during questioning. Both men were arrested. Both of their hands tested positive for gun shot residue.

Beginning about 8:00 a.m. on February 28, 2002, officers

> conducted a search of the Carolina Street apartment. They found a .357 revolver in the fireplace, dark clothing on the floor of the living room, dark clothing on the floor of defendant's bedroom, and six .357 shell casings on the windowsill in defendant's bedroom.
>
> ***Defense Case***
>
> The defense argued that there was nothing to connect defendant to the murder other than the testimony of Maxwell. Defense counsel attacked Maxwell's credibility and maintained that he testified against defendant in order to obtain a better plea deal for himself. Counsel pointed out that Maxwell was a drug dealer who owned the gun used to kill White, and that he lied repeatedly to police after his arrest. Citing the autopsy evidence that White had methamphetamine in his system when he died, the defense argued that White was killed by Maxwell over a drug debt, not by defendant over the cost of a broken clock.

Opinion at 1-4.

On September 3, 2003, the jury found petitioner guilty of first degree murder. Id. at 4. The trial court sentenced petitioner to 25 years to life in state prison. Id.

    B.    <u>Post Trial Proceedings</u>

        1)    <u>State Appellate Review</u>

Petitioner filed a timely appeal with the California Court of Appeal, First Appellate District, on April 21, 2004. Answer, Exhibit F at 2. On March 30, 2006, the California Court of Appeal affirmed petitioner's conviction in an unpublished decision. Answer, Ex. G. Petitioner then petitioned the California Supreme Court for review and that request was denied on June 14, 2006. Answer, Ex. H.

        2)    <u>State Habeas Review</u>

Petitioner filed a petition for a writ of habeas corpus in the Solano County Superior Court on June 27, 2007. Answer at 12. That petition was denied on August 21, 2007. Id. Petitioner then filed a petition for a writ of habeas corpus in the California Supreme Court. Answer, Ex. I. That petition was denied on March 12, 2008.

        3)    <u>Federal Habeas Review</u>

Petitioner filed this federal petition on November 11, 2007. On May 6, 2008,

respondent filed an answer. Petitioner then filed a traverse on June 9, 2008.

IV. APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Although "AEDPA does not require a federal habeas court to adopt any one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which guide its application.

First, the "contrary to" and "unreasonable application" clauses are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

/////

Bell v. Cone, 535 U.S. 685, 694 (2002). It is the habeas petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. Woodford

5

v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002). It is appropriate to look to lower court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

Second, the court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). So long as the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000).

Third, in determining whether a state court decision is entitled to deference, it is not necessary for the state court to cite or even be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2003). Moreover, a state court opinion need not contain "a formulary statement" of federal law, so long as the fair import of its conclusion is consonant with federal law. Id.

## V. DISCUSSION OF PETITIONER'S CLAIMS

### A. Extraneous Information

#### 1) Description of Claim

During voir dire Juror No. 8 disclosed that when the victim was 17 he was employed at a restaurant Juror No. 8 managed. Opinion at 5. Later, at a jury misconduct hearing, Juror No. 8 stated that he was familiar with the apartment complex where the shooting took place. Answer, Ex. C at 108-10. Juror No. 8 also may have known relatives of some witnesses including the sister of the victim's girlfriend. Id. at 109-10. During the jury's deliberations Juror No. 8 told another juror that the "particular area" where the crime occurred was a place for drug dealers, "lowlifes" and petty criminals. Id. at 111.

Petitioner argues these facts demonstrate that he was denied the right to a trial by an unbiased and impartial jury. Petition at 4, 11. Specifically he argues that these facts not only

prove that Juror No. 8 was biased against petitioner, but that the information about the "particular area" also biased other jurors against him. Id. at 13.

/////

/////

2) <u>State Court Opinion</u>

The California Court of Appeal rejected this claim stating:

> Although their testimony on the point was ambiguous, two jurors arguably agreed with Juror No. 9's claim that Juror No. 8 made one or more disparaging comments about drug use in the apartment complex where the victim died. However, no juror, including Juror No. 9, reported that Juror No. 8's alleged comments affected the jury's deliberations or influenced any juror's views. In fact, it is difficult to see how such comments would have prejudiced the jury against defendant. Before beginning deliberations, the jury heard undisputed evidence that the victim's blood was found to contain methamphetamine at autopsy. Maxwell admitted that he sold methamphetamine. The defense's own theory was that Maxwell killed the victim over a drug debt he owed to Maxwell. Thus, extraneous information that drug users lived in the area added nothing of substance to what the jurors already knew from the evidence. If considered by jurors, the comments attributed to Juror No. 8 would, if anything, have risked prejudicing them *against* the victim, and in favor of the defense theory of the case. However, assuming Juror No. 8 made the comments, we find no substantial evidence that he pressed them on the other jurors, or that other jurors credited or considered such comments in reaching their verdict.
>
> We also reject any claim that Juror No. 8 was personally biased or prejudiced. A passing comment during deliberations that there was a lot of drug use in the area where the crime occurred does not establish Juror No. 8's bias against the defendant. The fact that Juror No. 8 knew the victim seems far more suggestive of possible prejudice than his passing comment about the neighborhood, yet apparently no one objected to seating Juror No. 8 after he disclosed it. Juror No. 8's knowledge of the area was simply one aspect of the background and experience that he brought with him to his jury service. There is no evidence that he was so convinced of its importance to the case that he could not consider the trial evidence and reach a fair determination as to defendant's guilt or innocence.
>
> Although Juror No. 8 admitted that he had recognized persons testifying or attending the trial as relatives of acquaintances, the trial court credited his statement that this did not affect his consideration of the evidence. Substantial evidence supports the trial court's determination on that point. No evidence was adduced

<pre>
                that Juror No. 8 had a direct or personal relationship with any
                witness or attendee of a nature that would have affected his ability
                to be impartial.
</pre>

Opinion at 9-10.

        3)      <u>Applicable Law</u>

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961). Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982). <u>See also</u> <u>United States v. Plache</u>, 913 F.2d 1375, 1377-78 (9th Cir. 1990). Jurors are objectionable if they have formed such deep and strong impressions that they will not listen to testimony with an open mind. <u>Irvin</u>, 816 U.S. at 722 n.3. A defendant is denied the right to an impartial jury if even one juror is biased or prejudiced. <u>Dyer v. Calderon</u>, 151 F.3d 970, 973 (9th Cir. 1998) (en banc); <u>United States v. Eubanks</u>, 591 F.2d 513, 517 (9th Cir. 1979). Thus, "[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." <u>United States v. Gonzalez</u>, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting <u>Dyer</u>, 151 F.3d at 973 n.2).

As the Ninth Circuit has explained, "evidence developed against a defendant must come from the witness stand." <u>Fields v. Brown</u>, 503 F.3d 755, 779 (9th Cir. 2007). When the jury breaches its duty to decide the case based solely on the evidence introduced at trial, by considering extraneous facts not introduced in evidence, "a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence." <u>Hughes v. Borg</u>, 898 F.2d 695, 699 (9th Cir. 1990) (quoting <u>Gibson v. Clanon</u>, 633 F.2d 851, 854 (9th Cir.1980)). However, "the extent, if at all, to which the jurors saw or discussed the extrinsic evidence," is a question of historical fact as to which the state court's findings are entitled to a presumption of correctness. <u>Dickson v. Sullivan</u>, 849 F.2d 403, 406 (9th Cir. 1988). <u>See also</u> 28 U.S.C. § 2254(e).

It is clearly established federal law that prejudicial extraneous influence on a jury constitutes misconduct which may result in the reversal of a conviction. Parker v. Gladden, 385 U.S. 363, 364-65 (1966) (bailiff's prejudicial comments warranted reversal). However, "[o]n collateral review, trial errors-such as extraneous information that was considered by the jury-are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict." Estrada v. Scribner 512 F.3d 1227, 1235 (9th Cir. 2008) (citing Jeffries v. Wood, 114 F.3d 1484, 1491 (9th Cir. 1997)) (citing Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)). See also Rushen v. Spain, 464 U.S. 114, 115-19 & n.3 (1983) (affirming state court's determination that a juror's ex parte communication with trial judge was harmless beyond a reasonable doubt); Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) (applying "harmless-error" standard when a venire member stated during voir dire that he had read in a newspaper that the defendant had "pleaded guilty at one time and changed it"). Cf. Caliendo v. Warden of California Men's Colony, 365 F.3d 691, 695-98 (9th Cir. 2004) (recognizing that United States Supreme Court jurisprudence requires courts to presume prejudice in cases involving unauthorized contact between a juror and a witness, an interested party, or the officer in charge).

Several factors are relevant to determining whether the alleged introduction of extrinsic evidence constitutes reversible error: (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of whether the introduction of extrinsic material substantially and injuriously affected the verdict. Estrada, 512 F.3d at 1238. See also Sassounian v. Roe, 230 F.3d 1097, 1109 (9th Cir. 2000).

  4) Discussion

Juror No.8 did not know any of the witnesses who testified at the trial. RT at 109.

1  It does not appear that Juror No.8 noted to any other juror that he was familiar with a relative of
2  anybody involved in the trial or that the matter was ever discussed during the jury's
3  deliberations.  As the state appellate court found, there is no evidence that Juror No. 8 had a
4  direct or personal relationship with any witness or attendee of a nature that would have affected
5  his ability to be impartial.  Petitioner has failed to offer any evidence to refute that finding.

6  The fact that Juror No. 8 may have known relatives of some witnesses is less of a
7  concern than the fact that Juror No. 8 personally knew the victim.  However, after Juror No.8
8  informed petitioner that he had previously been the victim's manager petitioner did not object to
9  Juror No.8 serving on the jury.  Petitioner cannot now object and argue that fact alone proves
10 Juror No.8 was biased.

11 With respect to petitioner's argument that Juror No.8 raised extraneous
12 information during the jury's deliberations he has failed to show that the information was
13 prejudicial or had an injurious effect on the jury's verdict.  Petitioner's defense's was that the
14 victim was shot by Mr. Maxwell, an admitted drug dealer, over a drug debt.  Thus even if Juror
15 No.8 stated that the victim's neighbor was a place for drug dealers and criminals that statement
16 would only bolster petitioner's defense that the victim was killed because of a drug debt and not
17 because of a broken clock.

18 Petitioner has failed to show that the jury was biased or prejudiced against him or
19 that the alleged comments were prejudicial to him.  He therefore is not entitled to relief on this
20 claim.

21 B. Failure to Testify

22 1) Description of Claim

23 Petitioner argues that the jury impermissibly considered the fact that he did not
24 testify. Petition at 4. He argues that some jurors stated during deliberations that if "he did not
25 testify he must have something to hide." Id. at 6.  He argues that this alleged discussion was "an
26 overt act of misconduct." Id. at 22.

|   |   |
|---|---|
| 1 | 2) <u>State Court Opinion</u> |
| 2 | In rejecting this claim the California Court of Appeal stated: |

> As to the issue of defendant's failure to testify, the trial court found in relevant part as follows: "[T]here was nothing in the jurors' testimony at the hearing demonstrating that the defendant's failure to testify was the subject of discussion or an agreement, by any means, by the entire jury; that it wasn't anything beyond just transitory comments made during deliberations.... [¶] My recollection is that when the subject came up, according to the jurors, it was only in passing; and that the fellow jurors suggested to their other jurors-to the jurors who may have made such a comment, they pointed out the impropriety of those comments; and that the jury just moved on to other topics and other issues."
>
> The trial court's findings accurately reflect the testimony of the jurors who could recall the issue being raised, with the exception of Juror No. 9. The fact that six of the twelve jurors could not even remember the issue coming up "tends to indicate that this was not a discussion of any length or significance." (<u>People v. Hord</u> (1993) 15 Cal.App.4th 711, 728.) Substantial evidence thus supports the court's findings that the issue came up only in passing, and was stopped in its tracks by other jurors who quickly redirected the discussion to proper subject matters. As stated in <u>Romo v. Ford Motor Co.</u> (2002) 99 Cal.App.4th 1115 (disapproved on other grounds in <u>People v. Ault</u> (2004) 33 Cal.4th 1250, 1272, fn. 15): "[T]hrough group discussion of the law and the evidence, our common law system trusts that jurors who express wrong ideas about the evidence, the law, and their duty as jurors will be guided to a correct view of the case. In the absence of an opportunity for jurors to express such wrong conceptions and thereafter change their thinking, a jury trial might just as well conclude with the submission of ballots from the jury box at the close of the case." (<u>Romo v. Ford Motor Co.</u>, at p. 1136.)
>
> On this record, we find no substantial likelihood that defendant suffered actual harm as a result of improper juror comments on his failure to testify.

Opinion at 10.

         3) <u>Applicable Law and Discussion</u>

In analyzing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." <u>United States v. Klee</u>, 494 F.2d 394, 396 (9th Cir.1974). Thus, allegations of juror misconduct are cognizable federal habeas claims to the extent a petitioner is arguing that he was denied a fair

11

trial.  See Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir.1993) (finding that question on habeas review is whether juror misconduct deprived defendant of his or her right to fair trial).  "To obtain relief, petitioners must now show that the alleged error " 'had substantial and injurious effect or influence in determining the jury's verdict.' "  Id. at 1190 (quoting Brecht, 507 U.S. at 637-639 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); see also Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000).

The Sixth Amendment guarantee of a fair trial requires that the verdict be based upon evidence introduced at trial.  Hollbrook v. Flynn, 475 U.S. 560, 567 (1986) (stating "[c]entral to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial' ") (quoting Taylor v. Kentucky, 436 U.S. 478, 485 (1978)); Turner v. Louisiana, 379 U.S. 466, 472-473 (1965).  A defendant is denied the rights of confrontation, cross-examination and assistance of counsel guaranteed by the Sixth Amendment when a jury is exposed to extrinsic evidence.  Lawson v. Borg, 60 F.3d 608, 612 (9th Cir. 1995).  A petitioner's failure to testify in his own defense however is not extrinsic evidence.  Raley v. Ylst, 470 F.3d 792, 803 (9th Cir.2006) (citing United States v. Rodriguez, 116 F.3d 1225, 1226-1227 (8th Cir.1997).

In Raley, the Ninth Circuit found that the jury's consideration of constitutionally prohibited topics, including a defendant's decision not to testify on his own behalf, did not violate the Sixth Amendment because the information was not extrinsic evidence.  Thus, even if the jury discussed petitioner's failure to testify that would not constitute a violation of petitioner's right to a fair trial and he therefore is not entitled to relief on this claim.

C. Insufficient Evidence

1) Description of Claim

Petitioner argues there was insufficient evidence to support his conviction.

12

Specifically, he argues that there was no "physical evidence or any independent evidence to connect [him] to this crime aside from an alleged co-defendant's hearsay testimony." Petition at 8.

2) <u>Applicable Law</u>

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). <u>See also</u> <u>Prantil v. State of Cal.</u>, 843 F.2d 314, 316 (9th Cir. 1988). "[T]he dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 318). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case. <u>Id.</u> at 1275 & n.13.

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. <u>Adamson v. Ricketts</u>, 758 F.2d 441, 448 n.11 (9th Cir. 1985), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, 789 F.2d 722 (9th Cir. 1986) (en banc), <u>rev'd</u>, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Jackson</u>, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. <u>McMillan v. Gomez</u>, 19 F.3d 465, 469 (9th Cir. 1994). The

13

relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991). Thus, "[t]he question is not whether we are personally convinced beyond a reasonable doubt" but rather "whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

### 3) Discussion

Petitioner was found guilty of first degree murder in violation of California Penal Code section 187(a). Opinion at 1,4. Under § 187(a), the unlawful killing of a human being with malice aforethought is murder. CAL. PENAL CODE § 187(a).

Jason Maxwell's testimony described in detail petitioner's actions surrounding the shooting. Maxwell described how petitioner drove to the victim's apartment, got a gun from Maxwell, covered his face with a ski mask, and went into the apartment after Maxwell kicked in the door. RT at 576, 578, 580, 589. Maxwell testified that shortly thereafter he heard multiple gunshots. Id. at 590. Presented with theses facts rational jurors could reach the conclusion that these jurors reached.

While petitioner argues that the only evidence against him is Maxwell's testimony there is no Supreme Court authority requiring corroboration of accomplice testimony. To the contrary the Supreme Court has stated that "the use of accomplice testimony is not catalogued with constitutional restrictions." U.S. v. Augenblick, 393 U.S. 348, 352 (1969): see also U.S. v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993); United States v. Lopez, 803 F.2d 969, 973 (9th Cir.1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face."); Sabari v. United States, 333 F.2d 1019, 1020 (9th Cir.1964) ("the uncorroborated testimony of an accomplice, if believed by the jury, is sufficient to support a jury verdict."). Thus there is no constitutional

14

violation even if petitioner was convicted solely on Maxwell's testimony. There is however sufficient evidence to support the jury's verdict even without Maxwell's testimony.

The victim's girlfriend testified that petitioner was angry about the broken clock and blamed the victim. RT at 143. A detective testified that petitioner's girlfriend said that petitioner had "been kind of after [the victim] to have him - - give him money to replace the clock." Id. at 456. A police officer testified that petitioner was detained at the perimeter of the crime scene shortly after the shooting and made several false statements. Id. at 393-401. Evidence was also introduced showing that petitioner's hands tested positive for gunshot residue and that shells from the gun used to murder the victim were found in his bedroom as was a pile of dark clothing. Id. at 401, 504-08.

Even without Maxwell's testimony rational jurors could reach the conclusion that these jurors reached, specifically that petitioner was responsible for the unlawful killing of the victim with malice aforethought. Petitioner therefore is not entitled to relief on this claim.

    D.    Prosecutorial Misconduct

        1)    Description of Claim

During closing arguments the prosecutor argued that petitioner had said "they can't identify me" and claimed Jason Maxwell was just "running his mouth" but did not proclaim his innocence. RT at 1076. The prosecutor went on to state, "[b]y his own words, he has told you he committed this crime . . ." Id. at 1079. Petitioner argues that he never made any admission and that the prosecutor "grossly prejudiced" his trial by telling the jury he admitted to killing the victim. Petition at 9, 25.

        2)    Applicable Law

A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. Darden v. Wainwright, 477 U.S. 168, 181 (1986). However, such misconduct does not, per se, violate a petitioner's constitutional rights. Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181, and

1  Campbell v. Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Claims of prosecutorial
2  misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether
3  the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction
4  a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation
5  omitted).  See also Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416
6  U.S. 637, 643 (1974); Turner v Calderon, 281 F.3d 851, 868 (9th Cir. 2002).  Relief on such
7  claims is limited to cases in which the petitioner can establish that prosecutorial misconduct
8  resulted in actual prejudice.  Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at 637-38); see
9  also Darden, 477 U.S. at 181-83; Turner, 281 F.3d at 868.  Put another way, prosecutorial
10 misconduct violates due process when it has a substantial and injurious effect or influence in
11 determining the jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).
12 Finally, it is the petitioner's burden to state facts that point to a real possibility of constitutional
13 error in this regard.  See O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990).

14    In considering claims of prosecutorial misconduct involving allegations of
15 improper argument the court is to examine the likely effect of the statements in the context in
16 which they were made and determine whether the comments so infected the trial with unfairness
17 as to render the resulting conviction a denial of due process.  Turner, 281 F.3d at 868; Sandoval
18 v. Calderon, 241 F.3d 765, 778 (9th Cir. 2001); see also Donnelly, 416 U.S. at 643; Darden, 477
19 U.S. at 181-83.  Thus, in order to determine whether a prosecutor engaged in misconduct in
20 closing argument, it is necessary to examine the entire proceedings to place the remarks in
21 context.  See United States v. Robinson, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment must
22 be examined in context. . . ."); Greer, 483 U.S. at 765-66; Williams v. Borg, 139 F.3d 737, 745
23 (9th Cir. 1998).

24    3) <u>Discussion</u>

25    During Jason Maxwell's direct examination he testified that on the way to the
26 victim's apartment petitioner stated that he was going to "[l]ay the dude down."  RT at 577.  Mr.

Maxwell also testified that after the shooting petitioner said that he "put three in [the victim's] head." Id. at 598

During Detective Strang's direct examination he testified that he interviewed petitioner shortly after the crime. RT at 431-461. According to Detective Strang's testimony when petitioner was confronted with the fact that dark clothing had been removed from his residence, he stated, "[t]hey can't even identify me in the police reports, and [Jason Maxwell] is running his mouth." RT at 451.

The prosecutor's statements were founded on evidence presented during the trial and were entirely proper. Petitioner interprets the prosecutor's argument that "[b]y his own words, he has told you he committed this crime " too literally. The prosecutor was not stating that petitioner had made a formal confession prior to trial.[2] Instead the prosecutor was arguing that the statements petitioner made to Jason Maxwell and Detective Strang imply his culpability.

Based on these facts petitioner has failed to show that the prosecutor engaged in any misconduct or that his trial was fundamentally unfair and he therefore is not entitled to relief on this claim.

VI. CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

---

[2] Petitioner did not testify at trial.

1 that failure to file objections within the specified time may waive the right to appeal the District
2 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3 DATED: April 24, 2009

```
                          CHARLENE H. SORRENTINO
                          UNITED STATES MAGISTRATE JUDGE
```